## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Sergeant DANIEL HALLINAN,<br>73 Spencer Hill Road<br>Sanford, ME 04073<br><br>*Plaintiff,*<br><br>v.<br><br>THE HONORABLE MARK AVERILL,<br>in his official capacity as acting<br>SECRETARY OF THE ARMY,<br>101 Army Pentagon<br>Washington, DC 20310-0101<br><br>*Defendant.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 1:25-441 |

## **COMPLAINT**

### *Introduction*

Sergeant Daniel Hallinan served valiantly in the United States Army for over eight years from 2000 to 2008 and was honorably discharged for medical disability resulting from his combat experience. During his service in the Army, he was deployed three times: once to Afghanistan and twice to Iraq. SGT Hallinan endured incredible physical hardships during his deployments. Most seriously, he was stabbed by an Iraqi assailant in combat, which necessitated evacuation from the combat theater and medical treatment, The injury nearly cost him his life and left him with significant nerve pain, which plagues him to this very day, and a grizzly scar on his left shoulder.

Upon his discharge, SGT Hallinan was given partial disability severance pay, not a full medical retirement. He was also denied the Combat Action Badge and Purple Heart, which he had earned through his engagement with the enemy and injury in combat. Seeking to correct these errors and injustices, SGT Hallinan applied to the Army Board for the Correction of Military

Records. He requested full medical retirement, an award of backpay and allowances, and an award of the Combat Action Badge and Purple Heart.

The Board agreed that SGT Hallinan had been wounded in combat and had undergone treatment for his wounds. Yet even though such an evidentiary finding entitles SGT Hallinan to the Combat Action Badge and Purple Heart under Army regulations, the Board declined to correct his records so that he could receive either award. The Board also denied his request for a full medical retirement and backpay and allowances in conclusory fashion, simply stating that he had provided "insufficient evidence."

In deciding SGT Hallinan's application, the Board made decisions contrary to law and regulation, failed to articulate a rational connection between the facts found and the decision made, failed to address or explain why it was not addressing SGT Hallinan's non-frivolous argument, and failed to correct injustice clearly present in the record. For all these reasons, SGT Hallinan accordingly seeks that this Honorable Court hold the Board's decision to be arbitrary and capricious, and a remand to the Board for a new review which complies with all applicable laws and regulations, under the continuing jurisdiction of this Court.

### *Jurisdiction*

1.    This Court has jurisdiction under 28 U.S.C. § 1331, and under 5 U.S.C. §706(2)(A), which provides for redress in the district courts based upon agency decisions which are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

### *Venue*

2.    Venue is proper under 28 U.S.C. §1391(e)(1).

2

*Parties*

3.    Plaintiff, Sergeant Daniel Hallinan, is a citizen of the United States who resides at the address listed in the caption. At all relevant times during the conduct that gave rise to this action, Plaintiff was a citizen of the United States, who was either actively residing in the United States, or on active-duty deployment with the United States Army.

4.    Defendant, the Honorable Mark Averill, is named exclusively in his official capacity as acting Secretary of the Army. The Secretary of the Army oversees the Army Board for the Correction of Military Records ("ABCMR", "the Board", or "Board"), which acts in the Secretary's name and makes decisions on behalf of the Secretary. *See* 10 U.S.C. § 1552(a)(1).

*Timeliness*

5.    SGT Hallinan received a letter denying his application to the Board on November 28, 2024. Therefore, this action is timely filed. *See* 28 U.S.C. § 2401(a); *Rempfer v. U.S. Dept. of Air Force Bd. for Correction of Military Records,* 538 F.Supp.2d 200, 206 (D.D.C. 2008).

*Statement of the Facts*

6.    SGT Hallinan's Army career began on July 7, 2000.

7.    SGT Hallinan enlisted in the Army due to his love and pride for the United States and his desire to defend the freedoms for which our nation stands.

8.    SGT Hallinan served with honor and distinction for over eight years, until December 2008.

9.    Following the terrorist attacks on September 11, 2001, SGT Hallinan deployed to Afghanistan in late 2001 in support of Operation Enduring Freedom.

10.    During Operation Iraqi Freedom, SGT Hallinan deployed to Iraq twice, from January 9, 2003, to January 15, 2004, and again from December 8, 2004, to December 6, 2005, respectively.

11.    On both of his deployments, SGT Hallinan saw combat on several occasions.

12.    The most significant combat injury SGT Hallinan suffered occurred during his first deployment to Iraq in the early spring of 2003, when he was stabbed in the shoulder by an Iraqi assailant.

13.    SGT Hallinan was injured so severely his unit thought he would not survive, and he was medically evacuated from combat theater.

14.    SGT Hallinan was brought in for care at Landstuhl Regional Medical Center, Landstuhl, Germany, from an air-vac hospital in Kuwait.

15.    In Landstuhl, SGT Hallinan was treated by Captain Kenneth Sweeney, U.S. Army.

16.    According to CAPT Sweeney, SGT Hallinan was in "excruciating pain (10/10 pain)" during his treatment. SGT Hallinan was given pain relief via intravenous morphine.

17.    A representative from SGT Hallinan's command visited SGT Hallinan in Landstuhl while he was undergoing treatment. Years later, CAPT Sweeney recalled this representative telling him that SGT Hallinan's injury had been so serious that he was "lucky to be alive."

18.    Recognizing the severity of SGT Hallinan's injury, SGT Hallinan's command recommended SGT Hallinan's entire treatment team, including CAPT Sweeney, for an award to recognize their efforts.

19.    Thanks to his own perseverance and the expert care of his doctors, SGT Hallinan was returned to combat duty.

20.    But the attack left SGT Hallinan with significant nerve damage, a permanent scar on his left shoulder, and continues to cause him significant pain.

21.    On June 4, 2003, SGT Hallinan was stationed at a fuel station for convoys headed towards Baghdad. The station was hit by a rocket propelled grenade and small arms fire.

22.    During the attack, SGT Hallinan was blown back by an explosion and lost consciousness.

23.    After the explosion, SGT Hallinan and the other members of his unit were able to secure the perimeter and repel further attacks into the night. Only two days later were they able to evacuate and continue their mission.

24.    At the time of this incident, SGT Hallinan was attached to the 515th Transportation Company.

25.    The Combat Action Medal had not been established at the time of these attacks; however, it has been awarded retroactively.  When the award was introduced in May 2005, the qualifying soldiers assigned to the 515th Transportation Company at that time who had participated in the June 4, 2003, attacks were awarded the Combat Action Badge.

26.    But any soldiers no longer attached to the 515th Transportation Company in May 2005, including SGT Hallinan, could not be included in the submission packet compiled by the 515th Transportation Company. This meant that SGT Hallinan was not given a Combat Action Badge for the events of June 4, 2003, while other soldiers who had participated in the exact same underlying engagement with the enemy did receive the award.

27.    In addition to the June 4, 2003, attack, SGT Hallinan suffered loss of consciousness and traumatic brain injuries ("TBI's") on three other occasions.

28.     First, on or about March 21, 2003, during his first deployment to Iraq, SGT Hallinan and his team were on a combat mission when an incoming mortar exploded. The force of the explosion blew SGT Hallinan back a few feet.

29.     After the mortar strike, SGT Hallinan was taken to a medical station for evaluation but was cleared and released back to his unit.

30.     On another occasion, sometime during SGT Hallinan's second deployment to Iraq from December 8, 2004, to December 6, 2005, an explosive device was dropped into his Humvee. SGT Hallinan was thrown from the vehicle and sustained multiple injuries and a concussion.

31.     The third occasion came a few weeks after the above incident. SGT Hallinan and his platoon were present at an ammunition dump where a fire occurred causing the ammunition to explode. SGT Hallinan was thrown 40 feet back and, again, lost consciousness.

32.     SGT Hallinan also severely injured his right knee in this incident. SGT Hallinan ultimately had surgery on this knee in February 2004. Because of the surgery, he still walks with a limp, and he can no longer run.

33.     Like many other veterans of Operations Enduring Freedom and Iraqi Freedom, SGT Hallinan's experiences in combat also caused him great psychological distress.

34.     While on a foot patrol, a suicide bomber blew himself up in SGT Hallinan's vicinity. On another occasion when SGT Hallinan was on patrol, a child handed him a hand grenade that was already live. He threw the grenade as far as he could, but the grenade was still only 25 feet or so distant from him when it detonated.

35.     SGT Hallinan would later be rated 70% disabled by the Department of Veterans Affairs ("VA") for his service-connected post-traumatic stress disorder ("PTSD").

36.     During both his deployments to Iraq, SGT Hallinan was also tasked with working at numerous burn pits. The material burned at these pits ranged from human waste to ammunitions and other items.

37.     On his first deployment to Iraq, SGT Hallinan also handled chemical weapons at Camp Taji without the benefit of protective equipment.

38.     On his second deployment to Iraq, SGT Hallinan was also exposed to other hazardous materials while deployed at Balad Air Base.

39.     Around this time SGT Hallinan began to experience unexplained nausea and vomiting, much to the alarm of his superiors.

40.     The nausea and vomiting progressed gradually starting in November of 2004. But it eventually got to the point where SGT Hallinan was vomiting three to four times each day.

41.     Each instance of vomiting would last approximately 5 to 10 minutes, followed by another 5 to 10 minutes of lightheadedness.

42.     Army physicians were unable to identify a physiological cause of this issue, but did not investigate whether a psychological cause might be responsible.

43.     Because of his unexplained nausea and vomiting, SGT Hallinan's deployment was curtailed because of his physical incapacity.

44.     SGT Hallinan suffered from unexplained nausea and vomiting for the next three years.

45.     But SGT Hallinan's nausea and vomiting were not the only medical issues afflicting him during this period.

46.     SGT Hallinan also contemporaneously struggled with asthma, for which he was diagnosed and prescribed an inhaler.

7

47.    Additionally, on or about March 17, 2004, SGT Hallinan was seen for "battle stress"[1] by a physician in Mannheim, Germany, related to his experiences in Iraq. At that time, SGT Hallinan could not sleep due to ongoing nightmares.

48.    SGT Hallinan was also diagnosed with depressive disorder following his return from Iraq in 2005.

49.    MRI testing in April 2008 also showed that SGT Hallinan exhibited increased T2 Signal and FLAIR Signal near the left lateral ventricle. Such findings are typically associated with TBI and can also indicate that the patient is suffering from PTSD.

50.    All SGT Hallinan's serious medical issues made his supervisors highly concerned for his career and, more importantly, his health.

51.    SGT Hallinan's supervisors accordingly recommended that he be retained in the Army yet transferred to a different Military Occupational Specialty ("MOS").

52.    On August 8, 2008, a Military Occupation Specialty Medical Retention Board referred SGT Hallinan to the Disability Evaluation System ("DES") after determining "the limitations imposed by his permanent profile are so prohibitive they preclude retraining and reclassification into any PMOS [Permanent Military Occupation Specialty] in which the Army has a requirement."

53.    The DES has two components. The first is a Medical Evaluation Board ("MEB"), an informal board which reviews duty related medical conditions that have been found to not meet medical retention standards under Army Regulation 40-501.

54.    An MEB is convened once the medical retention decision point is reached, or when a soldier's physician believes the soldier will not be able to return to duty for medical reasons.

---

[1] A somewhat antiquated term, synonymous with what we would today call PTSD.

55.    The findings of the MEB are referred to the second component of the DES, a Physical Evaluation Board ("PEB"), which formally determines a soldier's fitness for continued service and eligibility for disability compensation.

56.    On August 19, 2008, SGT Hallinan was evaluated by Dr. Tom Nguyen prior to his MEB.

57.    But Dr. Nguyen's assessment did not include any of SGT Hallinan's surgical history, and thus did not fully address the physical limitations of SGT Hallinan's right knee injury and subsequent surgery, his diagnosed arthritis, or the stab wound in his left shoulder and subsequent treatment.

58.    Dr. Nguyen's assessment also did not include information about SGT Hallinan's asthma.

59.    On August 19, 2008, the MEB considered only SGT Hallinan's nausea and recurrent vomiting and referred him to a Physical Evaluation Board ("PEB") to determine his fitness for further service.

60.    The PEB did not consider the physical limitations of SGT Hallinan's right knee injury, his diagnosed arthritis, or the stab wound in his left should and subsequent surgery. Nor did the PEB consider any possible impact of depression, PTSD, or TBI on SGT Hallinan, or his potential exposure to hazardous chemicals.

61.    On September 29, 2008, the PEB found SGT Hallinan medically unfit to serve, and assigned him a 10% rating for his service-connected disability (nausea and vomiting of an unknown etiology).

62.    SGT Hallinan was not rated for his combat incurred shoulder injury and subsequent treatment, his right knee and subsequent surgery, asthma, depression, PTSD, TBIs, or exposure to hazardous chemicals.

63.    This was despite ample documentation demonstrating that these conditions adversely impacted SGT Hallinan's ability to serve to a significant degree.

64.    For example, SGT Hallinan's right knee had a P3 permanent profile for his right knee under the Army's PULHES system.[2]

65.    Additionally, at no point during his time in the Army did any Army medical staff test SGT Hallinan for hepatitis C as a possible cause for his nausea and vomiting. Such testing was reasonable given SGT Hallinan's blood transfusion following his stabbing, and his general exposure to hepatitis C in Iraq.

66.    Despite the insufficient rating, SGT Hallinan was medically discharged with an honorable characterization of service on December 23, 2008. He received a one-time payment of $41,000.00 in disability severance pay.

67.    On February 12, 2009, shortly after his discharge, SGT Hallinan went to a VA hospital in the San Diego, California, area.

68.    During his visit SGT Hallinan filled out a PTSD and depression checklist.

---

[2] PULHES is an acronym for a system used by the branches of the United States military to evaluate physical fitness and stamina for each servicemember. PULHES stands for P (physical capacity/stamina), U (Upper extremities), L (Lower extremities) H (Hearing and ears), E (Eyes), and S (Psychiatric). Each letter in the acronym is paired with a number from 1 to 4, which designates the servicemember's physical capacity in each given area. A 1 rating indicates the highest possible level of physical capacity in each area, while a 4 is the lowest possible level of physical capacity.

69.    The results were dismal: SGT Hallinan scored a 53 on the PTSD score and a 12 on the depression score. Both scores were above the average range for veterans who had been diagnosed with PTSD or depression.

70.    Shortly thereafter, SGT Hallinan was diagnosed with chronic hepatitis C. The VA identified transfusion after injury and exposure in Iraq as possible risk factors.

71.    On February 4, 2014, the VA rated SGT Hallinan as 80% disabled owing to the following service-connected disabilities: PTSD (70%); bronchial asthma (10%); limited extension of knee (10%).

72.    In 2019, SGT Hallinan had a biopsy performed on his esophagus. The biopsy revealed precancerous cells.

73.    SGT Hallinan continues to suffer badly because of his PTSD and depression. He is continuously anxious, cannot hold a steady job, sometimes has difficulty controlling his bowels, and has extreme sensitivity to any sort of crowded groups or areas.

74.    SGT Hallinan also suffers from significant headaches on a nearly daily basis. His headaches are at times paralyzing and are often accompanied by dizziness. They can even cause SGT Hallinan to faint on occasion. The pain is so intense that SGT Hallinan will sometimes cry.

75.    SGT Hallinan also experiences insomnia because of flashbacks of memories from his deployments to Iraq.

76.    SGT Hallinan also has a prescription for the acid erosion in his esophagus from the constant vomiting he experienced while in the Army.

77.    Seeking relief and recognition for his sacrifices to the Nation, in 2015, SGT Hallinan applied to the Army Board for the Correction of Military Records.

78.    On May 17, 2016, the Board reviewed SGT Hallinan's application and determined the evidence presented did not demonstrate the existence of a probable error or injustice, denying relief.

79.    SGT Hallinan applied to the Board again on June 16, 2023, supporting his second application with new materials not previously offered in his first application. *See* 10 U.S.C. § 1552(a)(3)(D): "Any request for reconsideration of a determination of a board under this section, no matter when filed, shall be reconsidered by a board under this section if supported by materials not previously presented to or considered by the board in making such determination."

80.    In his second application, SGT Hallinan respectfully requested that the Board 1) award him a full medical retirement; 2) award him backpay and allowances; 3) retroactively award him a Combat Action Badge based upon the experiences and instances encountered during his deployments in Iraq; 4) retroactively award him the Purple Heart based upon his shoulder injury which he suffered during his first deployment to Iraq when he was stabbed by an Iraqi assailant; and 5) any other relief the Board deemed fit.

81.    In his application, SGT Hallinan argued that he satisfied the requirements for the Combat Action Badge and the Purple Heart, and that his record should be corrected so that he can receive those awards.

82.    SGT Hallinan also argued that the Hagel Memorandum necessitates the liberal review of cases related to PTSD, and that his physiological symptoms related to PTSD and TBI were not adequately investigated. In support of this argument, SGT Hallinan showed that clear evidence during his service in the Army demonstrated that he was experiencing PTSD and TBI symptoms which disqualified him from military service.

83.    SGT Hallinan also argued that Army physicians failed to adequately consider SGT Hallinan's complete medical history when evaluating him for retention.

84.    SGT Hallinan also argued that there was a lack of testing for non-gastrointestinal causes of his nausea and vomiting, such as hepatitis C, which constituted a grave error in his case.

85.    SGT Hallinan also argued that even if the source of his nausea and vomiting was unknown, a 10% rating is unjust according to military standards for the same symptoms given their frequency and their severity, as compared to similar issues in the rating system. In support of this argument, SGT Hallinan compared his symptomology to symptoms in other conditions under 38 CFR §§ 4.114, 4.130, demonstrating that because his nausea and vomiting interfered with his daily activities and was chronic, not intermittent, they warranted a service-connected disability rating of at least 30%.

86.    SGT Hallinan also argued that the Army did not keep adequate records during the first years of Operation Iraqi Freedom, and his combat related injuries were not adequately considered by previous Boards. In support of this argument, SGT Hallinan referenced the well-known problems which the Army experienced keeping records during the first years of Operation Iraqi Freedom.[3] SGT Hallinan pointed out that the Army has acknowledged that it failed to adequately maintain records, and that in some cases soldiers were ordered to destroy entire hard drives if there was the possibility that enemy combatants could obtain the information. As a result of these problems, SGT Hallinan argued, his combat injuries – including his stabbing by an Iraqi assailant – were not properly documented. SGT Hallinan also submitted photographic evidence of

---

[3] *See* "Lost to History: Missing War Records Complicate Benefit Claims by Iraq, Afghanistan Veterans", by ProPublica, published November. 9, 2012, 3:45 p.m. EST. Accessed at: https://www.propublica.org/article/lost-to-history-missing-war-records-complicate-benefit-claims-by-veterans; February 11, 2025.

his shoulder injury from the stabbing and a statement from CAPT Sweeney, his treating physician, to the Board.

87.     SGT Hallinan also argued that he was exposed to hazardous materials, and that this exposure could have potentially caused his nausea and vomiting, asthma, and precancerous cells in his esophagus.

88.     Finally, SGT Hallinan also argued that his medical record, when considered as a whole, merited a full medical retirement. In support of this argument, SGT Hallinan referenced his nausea and vomiting, asthma, recurrent shoulder pain, right knee injury, hepatitis C, and PTSD, all of which he incurred because of his Army service.

89.     SGT Hallinan submitted over 570 pages of documents as exhibits in support of his application. Many of these documents served to corroborate SGT Hallinan's medical issues – specifically, his nausea and vomiting, asthma, recurrent shoulder pain, right knee injury, hepatitis C, and PTSD.

90.     The Army Review Boards Agency ("ARBA") Medical Advisor reviewed SGT Hallinan's application and offered an opinion.

91.     In their opinion, the ARBA Medical Advisor argued that "the Liberal Consideration Policies outlined in the Secretary Hagel and Undersecretary Kurta memorandums address a former Service Member's request to modify the discharge characterization of their service based on a pre-discharge service incurred mental health condition and do not apply to disability processing."

92.     The ARBA Medical Advisor dismissed the evidence provided by SGT Hallinan which suggested that his right knee condition and PTSD disqualified him from service, and that his nausea and vomiting merited a greater than 10% service-connected disability rating.

93.    The ARBA Medical Advisor concluded that "neither an increase in [SGT Hallinan's] military disability rating nor a referral of his case to the DES is warranted."

94.    The Board reviewed SGT Hallinan's application on September 18, 2024. On November 28, 2024, the Board informed SGT Hallinan that it had denied his application for reconsideration and all his requested relief.

95.    Reviewing the case, the Board wrote regarding SGT Hallinan's stabbing by an Iraqi assailant and subsequent treatment at Landstuhl: "There are no documents in [SGT Hallinan's available service records pertaining to [SGT Hallinan's] MEDEVAC from Kuwait/Iraq to LRMC, the specific injury or source of the injury, or his return to Iraq in 2003."

96.    In its decision, addressing SGT Hallinan's requests for a Purple Heart and Combat Action Badge, the Board found that SGT Hallinan had indeed been "stabbed by an Iraqi assailant and seen by medical personnel."

97.    Nevertheless, the Board determined that the criteria for the award of a Purple Heart "was not met" for two reasons.

98.    First, the Board stated, "The governing regulation provides that for award of the Purple Heart, evidence provided must indicate [SGT Hallinan] suffered, as a result of hostile action, a concussion or TBI so disabling as to cause either loss of consciousness or restriction from full duty due to persistent signs, symptoms, or clinical finding, or impaired brain function for a period greater than 48 hours from the time of the incident. [SGT Hallinan] has no medical documentation showing a loss of consciousness nor that shows he was restricted from duty for a period equaling 48 hours or more."

99.    Under Army Regulation 600-8-22, there are three criteria which must be satisfied for the award of a Purple Heart: 1) the servicemember must be wounded, injured, or killed in

hostile action, terrorist attack, or friendly fire; 2) the wound or injury must have required medical treatment; and 3) Army medical records must reflect the treatment. *See* Army Regulation 600-8-22, ¶2–7, *i*(3)(*a-c*).

100.    There is no general requirement in Army Regulation 600-8-22 that a servicemember must incur "a concussion or TBI so disabling as to cause either loss of consciousness or restriction from full duty due to persistent signs, symptoms, or clinical finding, or impaired brain function for a period greater than 48 hours from the time of the incident" to receive a Purple Heart.

101.    That requirement only applies in the specific instance that the wound or injury claimed by the servicemember is a concussion or TBI. *See* Army Regulation 600-8-22, ¶2–7, *c*(3).

102.    However, and by the Board's own admission, SGT Hallinan had not claimed a concussion or TBI as the basis for his award of the Purple Heart. SGT Hallinan's stated injury was that he had been "stabbed by an Iraqi assailant and seen by medical personnel."

103.    Second, the Board stated that "there is no evidence the applicant was listed on the casualty roster."

104.    But the lack of documentation for his medical treatment was among the injustices SGT Hallinan had petitioned the Board to correct.

105.    The Board also determined that SGT Hallinan had not satisfied the criteria for the Combat Action Badge.

106.    Army Regulation 600-8-22, ¶8–8, *d*(2) provides that to receive a Combat Action Badge, a soldier must "be personally present and under hostile fire while performing satisfactorily in accordance with the prescribed rules of engagement in an area where hostile fire pay or imminent danger pay is authorized. A Soldier must also be executing an offensive or defensive act

while participating in combat operations, engaging, or being engaged by the enemy. A Soldier must be performing their assigned duties associated with the unit's combat mission in an area where hostile fire pay or imminent danger pay is authorized."

107.    It was this requirement for a Combat Action Badge which the Board determined that SGT Hallinan had not satisfied: "The Board determined the applicant's counsel did not demonstrate based on regulatory guidance, the applicant met the criteria for award of the combat action badge. Per regulation, the Soldier must be personally present and actively engaging or being engaged by the enemy and performing satisfactorily in accordance with the prescribed rules of engagement."

108.    Finally, the Board also wrote that it had determined, "there is insufficient evidence to support the applicant's counsel's contentions for physical disability retirement in lieu of physical disability separation with severance pay, with associated back pay."

109.    The Board never explained why it had determined that the voluminous evidence submitted by SGT Hallinan was insufficient to support his argument that he should have received physical disability retirement.

110.    The Board simply stated that it "concurred with the advising official finding that neither an increase in the applicant's military disability rating nor a referral of his case to the DES is warranted."

111.    Like the ARBA Medical Advisor, the Board stated that "the Secretary Hagel and Undersecretary Kurta memorandums address a former Service Member's request to modify the discharge characterization of their service based on a pre-discharge service incurred mental health condition and do not apply to disability processing."

112.    By declining to correct SGT Hallinan's record so that he could be awarded the Purple Heart, the Board made a decision contrary to law and regulation, failed to show a rational connection between the facts found and the decision made, and failed to correct injustice clearly present in the record.

113.    Additionally, by declining to correct SGT Hallinan's record so that he could be awarded the Combat Action Badge, the Board made a decision contrary to law and regulation, failed to show a rational connection between the facts found and the decision made, failed to address, or explain why it was not addressing, SGT Hallinan's non-frivolous argument, and failed to correct injustice clearly present in the record.

114.    Finally, the Board's determination that SGT Hallinan had provided "insufficient evidence" in support of his request for physical disability retirement in lieu of physical disability separation with severance pay, with associated back pay, failed to show a rational connection between the facts found and the decision made.

115.    All in violation of 5 U.S.C. § 706 (2)(A).

### *Plaintiff's First Claim*

**Violation of 5 U.S.C. § 706 (2)(A) – By Declining to Correct SGT Hallinan's Record So That He Could Be Awarded the Purple Heart, the Board Made a Decision Contrary to Law And Regulation, Failed to Show a Rational Connection Between the Facts Found And the Decision Made, And Failed to Correct Injustice Clearly Present in the Record.**

116.    The allegations of the preceding paragraphs are incorporated by reference as if fully stated herein.

117.    Federal courts have the obligation to "hold unlawful and set aside" any agency action which is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A).

118.    Like all federal agencies, the ABCMR is not permitted to make decisions which are contrary to law or regulation. *Walker v. Shannon,* 848 F. Supp. 250, 255 (D.D.C. 1994); *see also Accardi v. Shaughnessy,* 347 U.S. 260, 267 (1954).

119.    Additionally, to pass muster under 5 U.S.C. § 706 (2)(A)'s arbitrary and capricious standard, a Board must also be able to articulate an explanation which shows a "rational connection between the facts found and the choice made." *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626 (1986); *see also Frizelle v. Slater*, 111 F.3d 172, 176 (D.C. Cir. 1997) (adopting this standard for military correction boards).

120.    When a Board's "explanation for its determination ... lacks any coherence," a reviewing court is not required to defer to the Board's expertise, because the court cannot discern the Board's reasoning. *Haselwander v. McHugh*, 774 F.3d 990, 996 (D.C. Cir. 2014); *see also Coburn v. McHugh*, 679 F.3d 924, 926 (D.C. Cir. 2012).

121.    Although federal courts are admonished to employ a deferential standard when reviewing decisions of boards for the correction of military records, deference is not warranted where a board's reasoning is "utterly illogical…and patently unfair". *Haselwander*, 774 F.3d at 993, *quoting Coburn*, 679 F.3d at 926, *and United States v. Morgan*, 393 F.3d 192, 200 (D.C. Cir. 2004).

122.    In such cases, a board's judgment "is unworthy of any deference." *Haselwander*, 774 F.3d at 993.

123.    Moreover, military correction boards also have a statutory obligation to correct injustice when it is clearly present in the record. *See* 10 U.S.C. § 1552(a)(1); *Code v. McCarthy*, 959 F.3d 406, 415 (D.C. Cir. 2020).

124.    Correction boards "have a duty to determine whether there has been error or injustice and, if there has been, to grant thorough and fitting relief." *Dodson v. United States Gov't Dept. of Army*, 988 F.2d 1199, 1204 (Fed. Cir. 1993).

125.    If a Board "fails to correct an injustice clearly presented in the record before it, it is acting in violation of its mandate. And such a violation, contrary to the evidence, is arbitrary and capricious." *Yee v. United States*, 206 Ct. Cl. 388, 397 (1975), *adopted by Haselwander*, 774 F.3d at 996; *see also McKinney v. Wormuth,* 5 F.4th 42, 45 (D.C. Cir. 2021); *Code,* 959 F.3d at 415; *Roth v. United States*, 378 F.3d 1371, 1381 (Fed. Cir. 2004) (Secretary obligated not only to properly determine the nature of any error or injustice, but to take "such corrective action as will appropriately and fully erase such error or compensate such injustice"); *Sanders v. United States*, 594 F.2d 804, 812 (Ct. Cl. 1979) (holding that the Secretaries of the military departments, acting through Boards, have not only the "power" but also the "duty" to correct injustice).

126.    Here, the Board made a decision which was contrary to law and regulation, failed to show a rational connection between the facts found and the decision made, and failed to correct injustice clearly present in the record when it declined to correct SGT Hallinan's record so that he could receive the Purple Heart.

127.    Under Army Regulation 600-8-22, there are three criteria which must be satisfied for the award of a Purple Heart: 1) the servicemember must be wounded, injured, or killed in hostile action, terrorist attack, or friendly fire; 2) the wound or injury must have required medical treatment; and 3) Army medical records must reflect the treatment. *See* Army Regulation 600-8-22, ¶2–7, *i*(3)(*a-c*).

128.    The Board itself admitted that SGT Hallinan satisfied the first two criteria when he was "stabbed by an Iraqi assailant and seen by medical personnel."

129.    However, the Board made two arguments in support of its decision to nevertheless decline to correct SGT Hallinan's record so that he could be awarded the Purple Heart.

130.    First, the Board stated, "The governing regulation provides that for award of the Purple Heart, evidence provided must indicate [SGT Hallinan] suffered, as a result of hostile action, a concussion or TBI so disabling as to cause either loss of consciousness or restriction from full duty due to persistent signs, symptoms, or clinical finding, or impaired brain function for a period greater than 48 hours from the time of the incident. [SGT Hallinan] has no medical documentation showing a loss of consciousness nor that shows he was restricted from duty for a period equaling 48 hours or more."

131.    But there is no general requirement in Army Regulation 600-8-22 that a servicemember must incur "a concussion or TBI so disabling as to cause either loss of consciousness or restriction from full duty due to persistent signs, symptoms, or clinical finding, or impaired brain function for a period greater than 48 hours from the time of the incident" to receive a Purple Heart.

132.    That requirement only applies in the specific instance that the wound or injury claimed by the servicemember is a concussion or TBI – which was not the case for SGT Hallinan. *See* Army Regulation 600-8-22, ¶2–7, *c*(3).

133.    As the Board itself had stated, SGT Hallinan had not claimed a concussion or TBI as the basis for his award of the Purple Heart. SGT Hallinan's stated injury was that he had been "stabbed by an Iraqi assailant and seen by medical personnel."  SGT Hallinan claimed he was entitled because he was wounded in a hostile action.  *See* Army Regulation (citing to clause one of purpose heart requirements).  There is no dispute about this and SGT Hallinan is entitled to the award.

134.    The Board's first reason for declining to correct SGT Hallinan's record so that he could be awarded the Purple Heart, based on criteria SGT Hallinan did not claim, therefore fails to show a "rational connection between the facts found and the choice made", *Frizelle*, 111 F.3d at 176, "lacks any coherence," is "utterly illogical…and patently unfair," and thus is "unworthy of any deference." *Haselwander*, 774 F.3d at 993.

135.    The Board gave a second reason for declining to correct SGT Hallinan's record so that he could be awarded the Purple Heart: "there is no evidence the applicant was listed on the casualty roster."

136.    Binding case law in this Circuit holds that a military correction board acts arbitrarily and capriciously when it determines that a servicemember has been wounded, injured, or killed in hostile action, terrorist attack, or friendly fire; and that the wound or injury has required medical treatment; but declines to correct a servicemember's records and award a Purple Heart because of an absence of confirming medical records reflecting treatment for the wound or injury. *See Haselwander*, 774 F.3d at 1000 ("It simply makes no sense for the Board to say, "We are denying his application because he has no medical records," where the very error stated in [the applicant's] application to the Board was that his Army record lacks the medical records of his injury and treatment.")

137.    For these reasons, the Board's decision declining to correct SGT Hallinan's record so that he could be awarded the Purple Heart was contrary to law and regulation, and therefore arbitrary and capricious. Army Regulation 600-8-22, ¶2–7, *i*(3)(*a-c*); *see Walker,* 848 F. Supp. at 255.

138.    The Board's decision declining to correct SGT Hallinan's record so that he could be awarded the Purple Heart also failed to show a "rational connection between the facts found

and the choice made," and was arbitrary and capricious for that reason as well. *See Frizelle*, 111 F.3d at 176.

139.    Lastly, the Board's decision declining to correct SGT Hallinan's record so that he could be awarded the Purple Heart was arbitrary and capricious because it failed to correct injustice clearly present in the record. *See Yee*, 206 Ct.Cl. at 397; *see also Haselwander*, 774 F.3d at 998, "The obvious "error" in this case is the void in [SGT Hallinan's] medical record; the obvious "injustice" is that the void in [SGT Hallinan's] medical record has prevented him from receiving the Purple Heart to which he is entitled.")

140.    All in violation of 5 U.S.C. § 706 (2)(A).

### *Plaintiff's Second Claim*

**Violation of 5 U.S.C. § 706 (2)(A) - By Declining to Correct SGT Hallinan's Record So That He Could Be Awarded the Combat Action Badge, the Board Made a Decision Contrary to Law And Regulation, Failed to Show a Rational Connection Between the Facts Found And the Decision Made, Failed to Address, or Explain Why It Was Not Addressing, SGT Hallinan's Non-Frivolous Argument, And Failed to Correct Injustice Clearly Present in the Record.**

141.    The allegations of the preceding paragraphs are incorporated by reference as if fully stated herein.

142.    Federal courts have the obligation to "hold unlawful and set aside" any agency action which is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A).

143.    Like all federal agencies, the ABCMR is not permitted to make decisions which are contrary to law or regulation. *Walker,* 848 F. Supp. at 255; *see also Accardi,* 347 U.S. at 267.

144.    Additionally, to pass muster under 5 U.S.C. § 706 (2)(A)'s arbitrary and capricious standard, a Board must also be able to articulate an explanation which shows a "rational connection

between the facts found and the choice made." *Bowen*, 476 U.S. at 626; *see also Frizelle*, 111 F.3d at 176 (adopting this standard for military correction boards).

145.    When a Board's "explanation for its determination ... lacks any coherence," a reviewing court is not required to defer to the Board's expertise, because the court cannot discern the Board's reasoning. *Haselwander*, 774 F.3d at 996; *see also Coburn*, 679 F.3d at 926 (D.C. Cir. 2012).

146.    Although federal courts are admonished to employ a deferential standard when reviewing decisions of boards for the correction of military records, deference is not warranted where a board's reasoning is "utterly illogical…and patently unfair." *Haselwander*, 774 F.3d at 993, *quoting Coburn*, 679 F.3d at 926, *and Morgan*, 393 F.3d at 200.

147.    In such cases, a board's judgment "is unworthy of any deference." *Haselwander*, 774 F.3d at 993.

148.    A military correction board's decision is also considered arbitrary and capricious when it "entirely fail[s] to consider an important aspect of the problem" presented in an application. *See Motor Vehicle Manufacturers' Association v. State Farm Mutual Automobile Insurance Company*, 463 U.S. 29, 43 (1983).

149.    A Board entirely fails to consider an important part of the problem presented in an application if the Board either does not address, or does not explain why it is not addressing, non-frivolous arguments raised by an applicant. *See, e.g., Saint–Fleur v. McHugh*, 83 F.Supp.3d 149, 155 (D.D.C. 2015);  *Rudo v. Geren*, 818 F. Supp. 2d 17, 26-27 (D.D.C. 2011); *Calloway v. Brownlee*, 366 F. Supp. 2d 43, 55 (D.D.C. 2005); *Mudd v. Caldera*, 26 F.Supp.2d 113, 120-123 (D.D.C. 1998).

150.    A Board must address the "argument in its discussion or explain[] why it chose not

to address it." *Rudo*, 818 F. Supp. 2d at 26-7. *See also Blanco v. Wormuth*, 2023 WL 6809940 at

*6 (D.D.C. October 16, 2023) (holding that a Board "acknowledged many of Plaintiff's arguments

only to fail to address or resolve those arguments in any discernible way in its analysis.")

151.    A Board that meets an applicant's argument with silence has failed to consider that

argument. *Tennekoon v. Fanning,* 156 F.Supp.3d 208, 218 (D.D.C. 2016). *See also Roberts v.*

*Harvey*, 441 F.Supp.2d 111, 122 (D.D.C. 2006) (remanding where a Correction Board "failed to

grapple with what appears to be a substantial issue").

152.    If a Board fails to address, or fails to explain why it has not addressed, arguments

"which do not appear frivolous on their face and could affect the Board's ultimate disposition," a

reviewing court must remand the application to the Board to consider the argument. *Appleby v.*

*Harvey,* 517 F.Supp.2d 253, 266 (D.D.C. 2007) (quoting *Frizelle*, 111 F.3d at 177). *See also Saint-*

*Fleur,* 83 F.Supp.3d at 157-158 (holding that because the parties' briefing did not adequately

substantiate that the applicant's argument was frivolous, the proper course was a remand to the

Board).

153.    Finally, military correction boards also have a statutory obligation to correct

injustice when it is clearly present in the record. *See* 10 U.S.C. § 1552(a)(1); *Code*, 959 F.3d at

415.

154.    Correction boards "have a duty to determine whether there has been error or

injustice and, if there has been, to grant thorough and fitting relief." *Dodson*, 988 F.2d at 1204.

155.    If a Board "fails to correct an injustice clearly presented in the record before it, it is

acting in violation of its mandate. And such a violation, contrary to the evidence, is arbitrary and

capricious." *Yee*, 206 Ct.Cl. at 397 (1975), *adopted by Haselwander*, 774 F.3d at 996; *see also*

*McKinney,* 5 F.4th at 45; *Code,* 959 F.3d at 415; *Roth*, 378 F.3d at 1381 (Secretary obligated not

only to properly determine the nature of any error or injustice, but to take "such corrective action as will appropriately and fully erase such error or compensate such injustice"); *Sanders*, 594 F.2d at 812 (holding that the Secretaries of the military departments, acting through Boards, have not only the "power" but also the "duty" to correct injustice).

156.    Here, the Board made a decision contrary to law and regulation, failed to show a rational connection between the facts found and the decision made, failed to address or explain why it was not addressing SGT Hallinan's non-frivolous argument, and failed to correct injustice clearly present in the record when it declined to correct SGT Hallinan's record so that he could receive the Combat Action Badge.

157.    Army Regulation 600-8-22, ¶8–8, *d*(2) provides that to receive a Combat Action Badge, a soldier must "be personally present and under hostile fire while performing satisfactorily in accordance with the prescribed rules of engagement in an area where hostile fire pay or imminent danger pay is authorized. A Soldier must also be executing an offensive or defensive act while participating in combat operations, engaging, or being engaged by the enemy. A Soldier must be performing their assigned duties associated with the unit's combat mission in an area where hostile fire pay or imminent danger pay is authorized."

158.    It was this requirement for a Combat Action Badge which the Board determined that SGT Hallinan had not satisfied: "The Board determined the applicant's counsel did not demonstrate based on regulatory guidance, the applicant met the criteria for award of the combat action badge. Per regulation, the Soldier must be personally present and actively engaging or being engaged by the enemy and performing satisfactorily in accordance with the prescribed rules of engagement."

159.    But SGT Hallinan brought two instances to the Board's attention where he had satisfied the requirements of Army Regulation 600-8-22, ¶8–8, *d*(2).

160.    First, SGT Hallinan argued before the Board that he was stabbed by an Iraqi assailant.

161.    The Board itself found that this event had occurred: "the applicant was stabbed by an Iraqi assailant."

162.    The Board did not explain how getting stabbed by an enemy combatant does not qualify as being "personally present and actively engaging or being engaged by the enemy and performing satisfactorily in accordance with the prescribed rules of engagement" under Army Regulation 600-8-22, ¶8–8, *d*(2).

163.    The Board's determination that being stabbed by an enemy combatant does not satisfy the requirements of Army Regulation 600-8-22, ¶8–8, *d*(2) fails to show a "rational connection between the facts found and the choice made", *Frizelle*, 111 F.3d at 176, "lacks any coherence," is "utterly illogical…and patently unfair," and thus is "unworthy of any deference", *Haselwander*, 774 F.3d at 993.

164.    SGT Hallinan also raised a second occasion on which he had satisfied Army Regulation 600-8-22, ¶8–8, *d*(2)'s requirements.

165.    This second occasion was the June 4, 2003, attack which occurred when SGT Hallinan was attached to the 515th Transportation Company.

166.    When the Combat Action Badge award was introduced in May 2005, the qualifying soldiers assigned to the 515th Transportation Company at that time who had participated in the June 4, 2003, attack – SGT Hallinan's teammates – were awarded the Combat Action Badge.

167.    However, any soldiers no longer attached to the 515th Transportation Company in May 2005, including SGT Hallinan, could not be included in the submission packet complied by the 515th Transportation Company.

168.    This meant that SGT Hallinan was not given a Combat Action Badge for the events of June 4, 2003, while other soldiers who had participated in the exact same underlying engagement with the enemy did receive the award.  Had SGT Hallinan remain attached to the 515th, there is no doubt he would have been awarded the Combat Action Badge.

169.    SGT Hallinan brought this injustice to the Board's attention in his application.

170.    Yet the Board failed to correct it, in violation of the Board's statutory obligation to correct injustices clearly present in the record. 10 U.S.C. § 1552(a)(1); *Code*, 959 F.3d at 415.

171.    In fact, the Board did not even address, or explain why it was not addressing, SGT Hallinan's argument that the June 4, 2003, attack qualified him for an award of the Combat Action Badge. *See Rudo*, 818 F. Supp. 2d at 26-27.

172.    The Board's failure to address this argument by itself renders the Board's decision arbitrary and capricious and necessitates a remand. *Appleby,* 517 F.Supp.2d at 266; *see also Saint-Fleur,* 83 F.Supp.3d at 157-158.

173.    In sum: SGT Hallinan provided not just one, but two, instances in which he had satisfied the requirements of Army Regulation 600-8-22, ¶8–8, *d*(2).

174.    Yet the Board arbitrarily and capriciously declined to correct SGT Hallinan's record so that he could receive the Combat Action Badge.

175.    For the reasons given above, the Board made a decision contrary to law and regulation, failed to show a rational connection between the facts found and the decision made, failed to address or explain why it was not addressing SGT Hallinan's non-frivolous argument,

and failed to correct injustice clearly present in the record when it declined to correct SGT

Hallinan's record so that he could receive the Combat Action Badge.

176.    All in violation of 5 U.S.C. § 706 (2)(A).

### Plaintiff's Third Claim

**Violation of 5 U.S.C. § 706 (2)(A) – The Board's Determination That SGT Hallinan Had Provided "Insufficient Evidence" in Support of His Request for Physical Disability Retirement in Lieu of Physical Disability Separation with Severance Pay, with Associated Back Pay, Failed to Show a Rational Connection Between the Facts Found And the Decision Made.**

177.    The allegations of the preceding paragraphs are incorporated by reference as if fully

stated herein.

178.    Federal courts have the obligation to "hold unlawful and set aside" any agency

action which is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law." 5 U.S.C. § 706 (2)(A).

179.    To pass muster under 5 U.S.C. § 706 (2)(A)'s arbitrary and capricious standard, a

Board must be able to articulate an explanation which shows a "rational connection between the

facts found and the choice made." *Bowen*, 476 U.S. at 626; *see also Frizelle*, 111 F.3d at 176

(adopting this standard for military correction boards).

180.    A decision of a military correction board which is "devoid of reason and lacks

evidentiary support" cannot survive 5 U.S.C. § 706 (2)(A)'s arbitrary and capricious standard. *See*

*Morall v. DEA,* 412 F.3d 165, 180 (D.C. Cir. 2005).

181.    When a Board's "explanation for its determination ... lacks any coherence," a

reviewing court is not required to defer to the Board's expertise, because the court cannot discern

the Board's reasoning. *Haselwander*, 774 F.3d at 996; *see also Coburn*, 679 F.3d at 926.

182.    Here, the Board's determination that SGT Hallinan had provided insufficient

evidence in support of his request for physical disability retirement in lieu of physical disability

separation with severance pay, with associated back pay, failed to show a rational connection between the facts found and the decision made.

183.    While the Board determined that SGT Hallinan's evidence was insufficient, it never explained why, or what evidence would have been sufficient to substantiate SGT Hallinan's application and grant his requested relief.

184.    The Board's statement that it "concurred with the advising official finding that neither an increase in the applicant's military disability rating nor a referral of his case to the DES is warranted" does not cure this defect, because this statement is just a restatement of the Board's conclusion in other words. It does not provide any evidentiary basis for such a conclusion which this Court can measure.

185.    The Board's statement that "as outlined in the Secretary Hagel and Undersecretary Kurta memorandums address a former Service Member's request to modify the discharge characterization of their service based on a pre discharge service incurred mental health condition and do not apply to disability processing" also does not provide evidentiary support for the Board's conclusion regarding the insufficiency of SGT Hallinan's evidence, for two reasons.

186.    First, 10 U.S.C. § 1552(h) – which, as a Congressional statue, trumps the Hagel and Kurta Memorandums – requires military correction boards to apply a liberal standard to disability processing. *See Envtl. Def. Fund v. EPA*, 922 F.3d 446, 457 (D.C. Cir. 2019) ("A regulation can never trump the plain meaning of a statute"); *Younger v. Turnage*, 677 F. Supp. 16, 22 (D.D.C. 1988) ("An agency cannot issue regulations and directives which are inconsistent with an act of Congress"). *See also Doyon v. United States,* 58 F.4th 1235, 1246, 1248 (Fed. Cir. 2023)

187.    Second, even if the Board is correct, and the Hagel and Kurta Memorandums are binding here and do not apply to disability processing, this mere articulation of a legal principle

does not explain why SGT Hallinan's evidence is insufficient. *See Mori v. Dep't of the Navy*, 917 F.Supp.2d 60, 64 (D.D.C.2013) ("By not discussing plaintiff's evidence, the Secretary leaves plaintiff and the Court to scratch their heads as to why the Secretary found plaintiff's evidence unpersuasive.")

188.    Put another way, the Board never explained why SGT Hallinan's evidence failed their standards, and thus did not show a "rational connection between the facts found and the choice made." *Bowen*, 476 U.S. at 626; *see also Frizelle*, 111 F.3d at 176.

189.    The Board's decision was therefore "devoid of reason and lacks evidentiary support." *Morall,* 412 F.3d at 180.

190.    Because this Court cannot discern why the Board made the decision it made, it is not required to defer to the Board's reasoning. *Haselwander*, 774 F.3d at 996; *see also Coburn*, 679 F.3d at 926.

### *Prayer for Relief*

WHEREFORE, Plaintiff prays that judgment be entered:

(a) Holding that, by declining to correct SGT Hallinan's record so that he could receive the Purple Heart, the Board made a decision contrary to law and regulation, failed to show a rational connection between the facts found and the decision made, and failed to correct injustice clearly present in the record; and,

(b) Holding that, by declining to correct SGT Hallinan's record so that he could receive the Combat Action Badge, the Board made a decision contrary to law and regulation, failed to show a rational connection between the facts found and the decision made, failed to address, or explain why it was not addressing, SGT Hallinan's non-frivolous argument, and failed to correct injustice clearly present in the record; and,

(c)  Holding that the Board's determination that SGT Hallinan had provided "insufficient evidence" in support of his request for physical disability retirement in lieu of physical disability separation with severance pay, with associated back pay, failed to show a rational connection between the facts found and the decision made; and,

(d)  Holding that, for any or all of the above reasons, and pursuant to 5 U.S.C. § 706 (2)(A), the Board's entire decision is therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; and,

(e)  Remanding SGT Hallinan's case to the Board for a new review, under the contuning jurisdiction of this Court, which complies with all applicable laws and regulations; and,

(f)  An award of attorney's fees to SGT Hallinan for the costs of bringing this action; and,

(g)  Any other and further relief as the Court may deem, in the circumstances, be just and proper.

Dated February 14, 2025.                Respectfully submitted,

                                        */s/ Dylan Thayer*
                                        Dylan Thayer
                                        DC Bar No. 90015821

                                        /s/*David P. Sheldon*
                                        David P. Sheldon
                                        DC Bar No. 446039
                                        Law Offices of David P. Sheldon, P.L.L.C.
                                        100 M Street, S.E., Suite 600
                                        Washington, DC  20003
                                        Tel: 202.546.9575
                                        Fax: 202.546.0135
                                        *Attorneys for Plaintiff*